JOURNAL ENTRY AND OPINION
Appellant Catherine Hartman appeals from the decision to grant permanent custody of her two youngest children, Christopher Balazy (dob 5/12/92) and Charlie Hartman (dob 8/26/96), to the Cuyahoga County Department of Children and Family Services (CCDCFS). The Court of Common Pleas, Juvenile Division, also granted permanent custody of the appellant's two oldest two children, Tiffany Balazy (dob 3/23/86) and Ashley Balazy (dob 2/26/90), to CCDCFS. The appellant has dismissed her appeal as to the two elder children and issues relating to them are not discussed in this opinion.
On August 12, 1999, CCDCFS filed a complaint seeking permanent custody of the appellant's four children. Prior to this complaint, emergency custody had been obtained on December 15, 1998 for Tiffany, Christopher and Charlie. All four children were committed to emergency custody on March 11, 1999. On May 20, 1999, the children were once again committed to the emergency custody of CCDCFS. Emergency custody expired by operation of law each time it was obtained.
Various allegations of the complaint filed on August 12, 1999, are pertinent to this appeal. In the complaint CCDCFS alleged: that Brian Hartman, the appellant's husband, was violent toward her with the children present; that in October 1998, the appellant had Mr. Hartman arrested for domestic violence and secured a temporary protection order; that the appellant placed the children with her brother and sister-in-law, Elizabeth and John Balazy; that in December 1998, the appellant dropped the domestic violence charges and reconciled with her husband; and that the appellant was arrested for two drug-related charges in December, 1998. The complaint stated that the appellant initiated the services recommended in the case plan, but was unlikely to complete it or to demonstrate the ability within the near future to provide adequate care for the children.
The complaint also notes that Tiffany was placed in the guardianship of her aunt and uncle in 1988, but that this guardianship was terminated in 1997 when Tiffany was returned to her mother. In 1992, Ashley was committed to the temporary custody of the Lorain County Children Services, and in 1993 that legal custody was given to her aunt and uncle. Christopher was committed to the temporary custody of CCDCFS in 1995, but was returned to the appellant in February 1998. The aunt and uncle with whom the children currently reside are willing to adopt all of the children. The complaint further states that Christopher has special needs and has been referred to PEP for assessment. PEP recommended further diagnostic services and counseling. While visiting the children at her brother's home, the appellant undermined the efforts of the aunt and uncle to provide appropriate parenting.
This case came to trial for adjudication on November 4, 5, and 8, 1999. The court found clear and convincing evidence that Tiffany, Christopher and Charlie were neglected and that Ashley was dependent. The dispositional hearing was conducted on December 6, 1999. The final order was journalized on January 4, 2000. In this order the court found the children to be neglected and dependent and again found that the allegations of the complaint were proved by clear and convincing evidence. The court found that the children be placed with the parents within a reasonable time or should not be placed with the parents for the following reasons:
 Following the placement of the children outside of the home the parents failed continuously and repeatedly for a period of six (6) months or more to substantially remedy the conditions causing the children to be placed outside the home.
 The parent is unable to provide an adequate permanent home for the children in the foreseeable future due to the mother's chemical dependency.
 The parent has abused, neglected or allowed the children to be abused or neglected between the date of the filing of the complaint and the date of the filing of the Motion for Permanent Custody.
 The parent has failed or refused to provide basic necessities, regular support, visit or communicate with the children when able to do so or by other actions, has shown an unwillingness to provide an adequate permanent home for the children.
The court ordered that temporary custody be terminated and then committed the children to the permanent custody of CCDCFS.
During the adjudication hearing the court heard testimony from Ramone Ford, CCDCFS case worker; Elizabeth Balazy, the maternal aunt with whom the children are placed; Jean Marie Santell, Mr. Hartman's half sister; Janet Asche, Christopher's counselor at Applewood Centers; and the appellant. The record indicates that at the dispositional hearing the court conducted an in camera examination of the children and then heard the testimony of Dr. Anuszkiewicz, the psychologist for CCDCFS who conducted an evaluation of the appellant.
The evidence presented at trial reveals that on October 13, 1998, the appellant obtained a temporary protection order for herself and the children against Brian Hartman. A week later, the appellant voluntarily left her children with her brother and sister-in-law, John and Elizabeth Balazy. The Balazy's have five children of their own whose ages range from 26 to 11, but only the two minor children currently reside with them. There seems to be no question that the Balazys have provided a loving, secure and stable home for the appellant's children. The appellant was indicted for possession of drugs for two separate occurrences, one on December 2, 1998, and the other on December 13, 1998. As noted above, it was on December 15, 1998, CCDCFS first sought emergency custody.
Mrs. Balazy gave testimony regarding the appellant's repeated alcohol and drug abuse. Mrs. Balazy testified that at the CCDCFS staffing, the appellant stated that she would not attempt to comply with a case plan, but that the children should be placed with the Balazys. It was not until March 1999 that the appellant determined that she wished to have her children returned to her.
Mrs. Balazy testified that she received legal guardianship of Tiffany in 1988 when the child was 2 1/2 years of age. The appellant stated that she was not ready to be a mother. Tiffany remained with the Balazy's until 1997 when she was returned to the appellant. Ashley was brought to the Balazy home two days after she was born. After a week, the appellant and Ashley moved to Lorain County with a man named Russ. Russ obtained custody of Ashley for two years until it was determined by DNA testing that he was not Ashley's biological father. After a time in foster care, Ashley was placed with the Balazys and has resided there for seven of her nine years. Christopher was placed in the Balazy home at the age of 2 1/2 when a complaint for neglect was filed against the appellant. Christopher had been infected with genital warts.
On or about October 18, 1998, the appellant brought Tiffany, Christopher and Charlie to the Balazys. At that time, the appellant explained to Mrs. Balazy that Mr. Hartman had shoved and had struck Tiffany. The appellant stated that she had called the police and filed domestic violence charges. The appellant requested that the children remain with Mrs. Balazy. The appellant then left with the children, but returned them the next day and requested that Mrs. Balazy watch them while she attend an AA meeting. The appellant returned at approximately 10:30 p.m and once more took the children. The next day, the appellant brought the children over and again requested that they stay so that she could attend an AA meeting, but this time she requested that the children spend the night. Mrs. Balazy inquired as to how the children would attend school, and the appellant responded that Tiffany should call her at 6:00 a.m. and then she would pick the children up. This plan was followed, but even after letting the telephone ring and ring, there was no answer from the appellant. The appellant did not contact the Balazys for one entire week during which time the children did not attend school. No provisions had been made for the children. Charlie had only two bottles and four diapers. There was no food or extra clothing for any of the children. As it turned out, the appellant had been arrested for prostitution.
When Mrs. Balazy informed the appellant that she would be returning the children, the appellant requested that the children remain with the Balazys because of the domestic violence charges against Mr. Hartman. The Balazys traveled to the appellant's residence and retrieved beds and clothing for the children. Tiffany had to be transported to school by the Balazys because, absent any official custody or guardianship, the school would not transport Tiffany to school from the Balazy home. The Balazys requested that the appellant assist with transportation, but she refused. Mrs. Balazy testified that although the appellant visited the children at times, she has never asked for their return (Nov. 4, 1999, T. 112).
Mrs. Balazy testified that the appellant stated that the children were better off with the Balazys because Mr. Hartman mistreated the children. For example, when Christopher (age six) had an accident in his clothing, Mr. Hartman forced him to wear a diaper. Mrs. Balazy stated that when Charlie first came to the Balazy home she was very quiet, but mischievous. Now, Charlie has a spring in her step and is always on the go.
Mrs. Balazy also testified as to the medical needs of Christopher. When he arrived on her doorstep, he complained that his ears hurt. Tiffany stated that he had been taking pink medicine. The appellant was contacted and informed Mrs. Balazy that the course of medication was over. Mrs. Balazy received a second notice from the school that Christopher needed his ears checked. The appellant denied receiving the first notification from the school. Upon obtaining medical treatment, Christopher had tubes placed in his ears and underwent a tonsillectomy. Christopher also exhibited behavior difficulties such as masturbating in school, a preference for isolation in his bedroom, aggressiveness toward Charlie, and urinating and defecating in his clothing. When warm weather arrived, Christopher began defecating out of doors.
After a time, Christopher's behavior improved. However, when the visitation with the appellant began, Christopher had a relapse into his old behaviors. Christopher, upon return from the first visit with the appellant, stated that he no longer had to listen to Mrs. Balazy. Mrs. Balazy has also seen a great change in Charlie's behavior. After visitation with the appellant, Charlie became very insistent on having her way instantly and if denied would spit. At one point in her testimony, Mrs. Balazy emotionally testified:
 I love these kids. I love them. They're my nieces. They're my nephew. I've been there through day one with three of them. From day one, from birth, I've been with these kids, on and off all through their life. I've been there for Cathy on and off through her life. Whatever she's done, I've stuck behind her and I tried and I've tried. I want these kids to have a happy life. For once in their life, let their parents be held accountable for what they did, and let these kids get on with their life, and let them make their own mistakes, not from them. Not from them. And if they can't see that, I'm sorry, but that's how I feel. That's how I feel. They need a life.
(Nov. 4, 1999, T. 142).
Janet Asche testified that Christopher was referred to her for counseling on April 19, 1999. Christopher was very nervous and had difficulty focusing, the problems with defecation, and he had issues regarding safety in that he had hiding places in and around the house. As she worked with Christopher she began to see improvement. Christopher was very, very scared and stated that he did not want to visit the appellant. As Ms. Asche elaborated during cross-examination, Christopher was so scared that he was crying and shaking, literally to the point where he turned beet red and was sweating. Ms. Asche worked with Christopher so that he could remain calm. At a later point Ms. Asche recommended to CCDCFS that Christopher's visits with the appellant cease. Ms. Asche opined that when Christopher is forced to visit with the appellant, his fears and anxieties increase, as do his inappropriate behaviors.
Mr. Hartman's sister, Jean Marie Santell, testified as to the appellant's treatment of Charlie. When Charlie was first born, the appellant and her husband provided proper care. However, there came a time when this ceased. Charlie was hospitalized twice for malnutrition. Ms. Santell also testified that the Hartmans did not exhibit appropriate parenting skills. Christopher was required to fold laundry for the entire household, Tiffany was required to scrub floors and bathe the baby, abusive language was commonly used, there was yelling and emotional abuse, Christopher was placed in diapers for toileting accidents, Charlie was in the playpen so often that she chewed the top railing off like a dog, medical needs went unmet, and she and her family members spent a great deal of time caring for the appellant's children. Ms. Santell eventually threatened to call CCDCFS. Ms. Santell testified that Mr. Hartman admitted to using drugs in 1998. Mr. Hartman has two other biological children who are not in his care or custody and for whom he provides no support.
Ramone Ford testified that CCDCFS received its first referral regarding the appellant in 1994. This referral was unsubstantiated, but in 1995 there was a referral for neglect which was substantiated. At that time it was medically indicated that Christopher had been sexually abused and CCDCFS obtained custody. A case plan was developed for the appellant, but the appellant did not begin to work on the objectives in the case plan until 1996. In July of 1997, Christopher was returned to the appellant. Mr. Ford testified regarding the involvement of the Lorain County Department of Children and Family Services and testified that Tiffany and Ashley were born with a positive toxicology for cocaine. The appellant had a history of prostitution. Since the appellant did not comply with the Lorain County case plan, custody of the children was given to the Balazys.
After Tiffany and Christopher were returned to the appellant in 1997, CCDCFS received another referral in October 1998. An investigation revealed that the children had been left unsupervised in the home and found that there was domestic violence in the home. Although the appellant had obtained a protection order against Mr. Hartman, she informed Mr. Ford that nothing had happened. CCDCFS filed a complaint for custody of the children in December 1998, alleging that the children were dependent because the appellant left the children with the Balazys. CCDCFS was unable to contact the appellant because her whereabouts was unknown. At the staffing held regarding the children in November 1998, the appellant indicated that she was unwilling to comply with a case plan. The appellant stated that she wanted her brother and sister-in-law to have custody of the children. CCDCFS then filed for custody of the children. From December 1998 until March 1999 contact with the appellant was sporadic. The appellant did not have stable housing, but rather stayed with friends.
At a staffing held in March 1999, the appellant indicated that she would attempt to comply with objectives on the case plan which had been developed in November 1998. The appellant had completed the required drug assessment and after care program as well as parenting classes. Mr. Ford stated that medical testing was performed which ruled Mr. Hartman out as the father of Charlie. A psychological evaluation was performed on the appellant as required in the case plan. However, stable housing was not maintained for twelve months. Mr. Ford did not believe that the domestic violence and anger management components of the case plan had been met.
Mr. Ford testified that CCDCFS was not satisfied with the services completed by the appellant. He stated that the 1995 case plan required the same services. Once the appellant decided to comply, she completed many of the objectives. Three years later the 1998 case plan required the same services. This indicates that the appellant did not benefit from the services she received.
Visitation at the beginning was unscheduled. The appellant's visits never developed into a set pattern. Sometimes she would indicate that she would visit, but then not show up. Sometimes she would visit, but the visits would disrupt the family because the appellant would undermine the Balazys' authority. This disruption caused the visitation to be moved to the Metzenbaum Family Center. Tiffany and Ashley refused to attend the visits. Christopher and Charlie did participate in the visits. Christopher's visitation had to be stopped because his behaviors escalated to an unacceptable level. Christopher would act out in school, masturbate in school, pull down his pants, and was aggressive toward the other children. He was also urinating and defecating in his pants. Christopher's therapist recommended that visitation cease. Charlie continued to visit with her mother at the Metzenbaum Center. After the visits, Charlie would be disobedient, would make statements that she did not have to obey her aunt and uncle because she was to go home soon, she was difficult to settle down, and she was aggressive.
Mr. Ford has observed the children in the Balazy home. He testified that the children consider the Balazy home to be their home and that they are comfortable there. The Balazys and the children interact as though they are a family. The children follow the rules of the home and when they fail to do so there are age appropriate consequences. Although the children are in a nurturing atmosphere, problems remain. Christopher will require ongoing therapy as a result of sexual abuse.
The appellant has a criminal history, including drug possession charges, one on December 2, 1998 and the second on December 13, 1998.[1]
The appellant was convicted and given community control sanctions and placed under the supervision of the Adult Probation Department for two years.
Mr. Ford testified that based upon the appellant's criminal history, her history of drug abuse, her history of relapses, the history of referrals to the agency, and her history with CCDCFS, that the appellant would not benefit from the services the agency has to offer. He further testified that CCDCFS is desirous of obtaining permanent custody so that the children may be adopted; that CCDCFS made a determination that the cycle of leaving the children with the Balazys and then retrieving them at some later date has a detrimental effect on the children; and that the agency decided to step in and request permanent custody to break this cycle.
On cross-examination, testimony was elicited from Mr. Ford indicating that he was aware that the Hartmans' owned a home, but had rented it to tenants who were refusing to leave. During this time the Hartmans lived other places. Mr. Ford was unaware that the appellant had completed a domestic violence class. The appellant had not informed Mr. Ford as to whether or not she was attending AA/NA meetings. The was no way to contact the appellant except though a pager. Mr. Ford explained that attending classes is not sufficient to fulfill the requirements of the case plan. There must be some demonstration that the parent has learned to apply the lessons. In this case, there has been no such demonstration. Christopher's visitation had to be halted because of their detrimental effect.
The appellant sets forth three assignments of error.
The first assignment of error:
 IN DENYING MS. HARTMAN'S MOTION TO DISMISS WHEN NO CLEAR AND CONVINCING EVIDENCE OF EITHER NEGLECT OR DEPENDENCY HAD BEEN PRESENTED, THE TRIAL COURT ABUSED ITS DISCRETION, VIOLATED MS. HARTMAN'S STATE AND FEDERAL DUE PROCESS RIGHTS, AND IGNORED THE REQUIREMENTS OF JUV.R.29(F)(1).
The appellant asserts that, because she voluntarily placed the children with the Balazys, the State was required to show that the children did not receive adequate care in either residence. The appellant further posits that even had this test been met, the State failed to show by clear and convincing evidence that the children had suffered neglect.
This court has recently found that there are two ways in which CCDCFS may seek permanent custody of a child. In In re Fountain (Feb. 24, 2000), Cuyahoga App. No. 76650, unreported this court held:
 As this Court recognized in In re Vinci (Sept. 3, 1998), Cuyahoga App. No. 73043, unreported, there are two ways in which Family Services can seek permanent custody of a child:
 Ohio Law recognizes two mechanisms for committing a child to the permanent custody of a public children services agency. The agency may request permanent custody as the dispositional order pursuant to the filing of an original complaint for dependency, neglect, or abuse or the agency may file a motion for permanent custody subsequent to a prior order of temporary custody or long-term foster care.
R.C. 2151.353(A)(4); R.C. 2151.413; R.C. 2151.414
 In the case before us, as in the In re Vinci case, Family Services sought permanent custody of the children pursuant to the filing of an original complaint for dependency and neglect. As stated in In re Vinci, the standard of review of the trial court's order when Family Services requests permanent custody in an original complaint is no different from the standard when permanent custody is requested from temporary custody:
 If the parent against whom the allegations are made in a dependency complaint admits the allegations, or if clear and convincing evidence is presented at the adjudicatory hearing to establish the child is a dependent child, the court may enter an adjudication of dependency and proceed to disposition. R.C. 2151.353(A); Juv.R. 29(C); Juv.R. 29(E); Juv.R. 29(F)(2). If the adjudication is made, the court may grant permanent custody if it determines at the dispositional hearing by clear and convincing evidence in accordance with R.C. 2151.414(E) that the child cannot be placed with either parent within a reasonable time, or should not be placed with either parent, and if it determines in accordance with R.C. 2151.414(D) that the permanent commitment is in the best interest of the child. R.C. 2151.353(A)(4).
 The deference we must show the trial court's findings and determination was set forth by this Court in In re Awkal, 95 Ohio App.3d 309, 316 as follows:
 R.C. 2151.414(D) is written broadly and requires the juvenile court judge to consider all factors that are relevant to the best interests of the child. The purpose of a far-reaching inquiry is to allow the judge to make a fully informed decision on an issue as important as whether to terminate parental rights, privileges and responsibilities. The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. Moreover, the knowledge the juvenile court gains at the adjudicatory hearing through viewing the witnesses and observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony cannot be conveyed to a reviewing court by a printed record. See Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 10 Ohio B. Rep. 408, 410-411, 461 N.E.2d 1273, N.E.2d 1273, 1276; cf. Miller v. Miller (1988), 37 Ohio St.3d 71, 523 N.E.2d 846. Hence, this reviewing court will not overturn a permanent custody order unless the trial court has acted in a manner that is arbitrary, unreasonable or capricious. See Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 5 Ohio B. Rep. 481, 482, 450 N.E.2d 1140, 1142 (defining "abuse of discretion").
Thus, this court must uphold the trial court's finding absent an abuse of discretion. R.C. 2151.03(A) defines, in part, a neglected child as one whose parents, guardian, or custodian neglects the child or refused to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals or well being. In order to obtain permanent custody, CCDCFS was required to prove that the appellant failed in her duties as a parent as outlined in the statute.
Although the appellant's assertion that the State was required to show that the children did not receive adequate care either with her or the Balazys was not raised before the trial court, this court will consider the issue because it is capable of repetition. In support of her proposition, the appellant cites to In re Reese (1982) 4 Ohio App.3d 59, an appellate case not from this district. We acknowledge that in In re Riddle (1997), 79 Ohio St.3d 259 the Ohio Supreme Court cited to In re Reese in a positive manner. However, the court's discussion of Reese was not a part of the holding and therefore clearly dicta which need not be followed by this court. While there may be cases in which this court might apply the proposition outlined in In re Reese, we decline to do so in the case sub judice.
Even if this court did apply the holding in Reese, the record demonstrates that between the time the appellant voluntarily placed her children with her brother in October 1998 and the filing for emergency custody, the appellant was arrested on two drug possession charges. The face of the indictments list the dates of the offense of drug possession as December 2, 1998 and December 13, 1998. As noted above, it was on December 15, 1998, CCDCFS first sought emergency custody. Thus, at the time CCDCFS stepped in to obtain emergency custody, the appellant's arrest had superseded her voluntary placement of the children with her relatives. In addition, this court notes that between October and December the appellant, at anytime, could have reclaimed her children. She chose instead to further indulge in behavior antithetical to parenting.
As a further indication of the appellant's relinquishment of her children is the testimony indicating that when she attended the December 1998 staffing at CCDCFS regarding her children, she stated that the children should remain with the Balazys and that she was unwilling to attempt to meet the goals set forth in the case plan. The court heard testimony that the appellant reconciled with her husband after the holidays. It was not until March 1999, that the appellant again attended a CCDCFS staffing and indicated that she was willing to obtain the required services under the case plan. This court also notes that there was testimony regarding the appellant's history of substance abuse, attainment of sobriety, and subsequent relapses. The appellant is no stranger to human service organizations which in the past have obtained temporary custody and placed her children with relatives. Indeed, the court heard testimony from relatives of both Mr. and Ms. Hartman regarding the family support given for the sake of the children. Based on the appellant's history of conduct in her life and in this case, the trial court did not err in going forward with the permanent custody determination.
The appellant's first assignment of error is overruled.
The second and third assignment's of error may be considered together.
 THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EXTENSIVE DISPOSITIONAL EVIDENCE IN THE ADJUDICATORY PHASE OF TRIAL OVER MS. HARTMAN'S VIGOROUS OBJECTION.
The appellant argues that, while the court did hold separate hearings for adjudication and disposition, the court erred in hearing extensive dispositional evidence during the adjudication hearing.
The Ohio Supreme Court and this court have clearly held that there are to be separate adjudicatory and dispositional hearings. In In re Littlejohn (May 7, 1998), Cuyahoga App. No. 71354, unreported, this court cited to R.C. 2151.35 and to In re Baby Girl Baxter. This court held:
R.C. 2151.35(B) (1) states in pertinent part:
 If the court at an adjudicatory hearing determines that a child is an abused, neglected, or dependent child, the court shall not issue a dispositional order until after the court holds a separate dispositional hearing. The court may hold the dispositional hearing for an adjudicated abused, neglected, or dependent child immediately after the adjudicatory hearing if all parties were served prior to the adjudicatory hearing with all documents required for the dispositional hearing.
 The court in In re Baby Girl Baxter (1985), 17 Ohio St.3d 229, 479 N.E.2d 257, held: "In proceedings where parental rights are subject to termination, both the Juvenile Rules and the Revised Code prescribe that such proceedings be bifurcated into separate adjudicatory and dispositional hearings." Id. at paragraph one of the syllabus. Bifurcation is required where permanent custody is sought at the initial disposition. In re Brofford (1992), 83 Ohio App.3d 869, 615 N.E.2d 1120. A dispositional hearing is to be held only if the trial court first determines that the child is a neglected, abused, or dependent child. In re Riddle (1997), 79 Ohio St.3d 259, 680 N.E.2d 1227. It is then that the trial court has the authority to make a disposition pursuant to R.C. 2151.353. See Elmer v. Lucas Cty. Children Serv. Bd. (1987), 36 Ohio App.3d 241, 23 N.E.2d 540.
The purpose of having separate hearings is so that the required determination of the child's best interest, which is pertinent to disposition, does not become an issue in the objective decision as to whether or not a child has been abused, neglected or is dependent. As this court noted in In re Williams (Feb. 10, 2000), Cuyahoga App. No. 74921, unreported, only after an adjudication does the judge become vested with the authority to make a disposition pursuant to R.C. 2151.353.
In the present case, the trial court did hold two separate hearings. However, over objection of counsel, the court permitted much testimony which was relevant only to the best interest of the children. Specifically, the court heard the testimony of Christopher's counselor, Ms. Asche. Ms. Asche did not begin her therapy with Christopher until after emergency custody was obtained by the CCDCFS. Her testimony was crucial in making a determination as to Christopher's best interest, but was not properly before the court in the adjudicatory hearing. It is impossible to determine that this evidence did not influence the court. For this reason, this court reluctantly determines that this case must be remanded for rehearing.
The appellant's second assignment of error is well taken.
The appellant's third assignment of error is moot pursuant to App.R. 12.
This cause is reversed and remanded.
It is, therefore, considered that said appellant recover of said appellee her costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TIMOTHY E. McMONAGLE, P.J., CONCURS; PATRICIA A. BLACKMON, J., DISSENTS, WITH DISSENTING OPINION ATTACHED.
 __________________________ JAMES D. SWEENEY, JUDGE
[1] The court received as evidence two other indictments, one for violation of the drug law dated November 10, 1989, and another for escape dated April 6, 1990.